UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

                Plaintiff,

-against-

HALSTEAD PROPERTY, LLC, HALSTEAD MANHATTAN, LLC and AYO HAYNES,

                Defendant(s).

ECF CASE

**COMPLAINT**

Plaintiff JANE DOE, by and through her attorneys, Wagner Berkow, LLP, as and for her complaint, respectfully alleges and sets forth as follows:

## PRELIMINARY STATEMENT

1. Defendants unlawfully discriminated against Plaintiff, who is an African-American, homosexual woman, on the basis of her sex, sexual orientation, gender and/or familial status, in connection with Plaintiff's effort to purchase the condominium apartment in which she initially rented while single but subsequently began living with her fiancée, in violation of the Federal Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. § 3614(a).

{1455-0001/00028176-2}                  1

3. Venue is proper under 28 U.S.C. § 1391(b) because the actions giving rise to Plaintiff's allegations occurred in this district, the subject property is located in this district, and Defendants reside and/or do business in this district.

## THE PARTIES

4. Plaintiff resides within this district.

5. Upon information and belief, Defendant Ayo Haynes ("Haynes"), a licensed real estate broker, resides within this district.

6. At all times relevant to this action, Defendant Halstead Manhattan, LLC, f/k/a Halstead Property, LLC ("Halstead")[1], had been the listing agency for the seller in connection with the listing of the subject apartment for sale.

7. At all times relevant to this action, upon information and belief, Haynes was the employee, representative, and/or agent of Halstead and the exclusive listing agent for the apartment in question.

## FACTUAL ALLEGATIONS

8. Plaintiff is an African American, homosexual woman.

9. In or about February 1, 2012, Plaintiff moved into Unit #4 (the "Apartment") located at 123 West 131st Street (the "Building"), which is known as the Harlem Sol Condominium (the "Condominium"), pursuant to a lease agreement negotiated by Haynes between Plaintiff and Frederic Champel ("Seller" or "Champel"), and as renewed.

---

[1] Upon information and belief, Halstead Property, LLC changed its name of record to Halstead Manhattan, LLC, in April 2018.

{1455-0001/00028176-2}    2

10. The Building was newly built, upon information and belief, in or around October 2011, and is a "dwelling" within the meaning of 42 U.S.C. § 3602(b).

11. At all times relevant herein, Plaintiff had always paid her rent on time, and complied with her leasehold obligations.

12. In or about late March 2017, Haynes contacted Plaintiff and informed her that Champel wanted to sell the Apartment to her, and invited Plaintiff to make an offer to purchase it, due to Plaintiff's exemplary tenancy throughout the duration of Champel's ownership of the Apartment.

13. Haynes also referred Plaintiff to the names of several mortgage brokers, and eventually real estate lawyers, to assist her in purchasing the Apartment.

14. On or about March 25, 2017, Haynes visited Plaintiff at the Apartment, and Plaintiff introduced Haynes to Plaintiff's fiancée, Teka, who lived with Plaintiff.

15. Haynes' attitude and demeanor towards Plaintiff immediately changed after this visit, including avoidant and withdrawn behavior with respect to Plaintiff's efforts to purchase the Apartment.

16. Haynes then demanded that public showings of the Apartment were necessary for the Seller to consider Plaintiff's offer and that Plaintiff comply with such showings.

17. Haynes further demanded that Plaintiff and Teka not be present during such showings of the Apartment, and discouraged Plaintiff from accepting an invitation to Haynes' church after Haynes made comments about religion to the Plaintiff in the presence of her fiancée.

18. On or about March 27, 2017, Plaintiff offered $405,000 to purchase the Apartment, and through Haynes, Seller counteroffered $425,000 two days later.

19. Plaintiff thereafter sought to increase her offer on the Apartment, but Haynes did not respond to Plaintiff's communications.

20. Or about April 19, 2017, having still not heard back from Haynes, Plaintiff contacted the Seller directly to accept his $425,000 counteroffer, who referred Plaintiff back to Haynes.

21. Haynes denied recollection of the $425,000 counteroffer, and reported to Plaintiff that Seller was seeking only all-cash buyers, allegedly because banks would not approve loans for unit purchases in the Condominium.

22. However, at all times relevant herein, the Apartment listing stated that it was available to purchasers with up to 90% financing.

23. Upon information and belief, one or more recent purchasers of apartments in the Building had obtained financing.

24. A member of the Condominium board also advised Plaintiff that purchasers in the Building had no trouble obtaining loans for apartment financing.

25. Plaintiff obtained a mortgage preapproval for the purchase of the Apartment, increased her offer on the Apartment to $444,000 on or about April 19, 2017, and invited Haynes to discuss her concerns about the Condominium directly with Plaintiff's mortgage broker.

26. Plaintiff's mortgage broker thereafter contacted Haynes and offered to provide any information Seller required for the loan approval.

27. Haynes told Plaintiff and her mortgage broker that the Seller would accept Plaintiff's offer, if Plaintiff's bank could guarantee loan approval for the Apartment.

28. Haynes then demanded invasive financial details about Plaintiff that had no bearing on Plaintiff's ability to purchase the Apartment.

29. Haynes instructed Plaintiff's mortgage broker not to share certain information about the Condominium with Plaintiff.

30. A member of the Condominium board intervened on Plaintiff's behalf to provide additional Condominium information required by Plaintiff's prospective lender to issue a formal loan commitment.

31. Haynes told Plaintiff that Plaintiff's mortgage broker would need to review the Condominium's financials for the previous two years prior to approving a loan.

32. Plaintiff's mortgage broker, however, told Haynes that it did not need to review the Building's financials, had already determined the Condominium was eligible for financing, and that the bank only needed a signed contract to issue a formal loan commitment to Plaintiff.

33. Plaintiff's mortgage broker told Plaintiff that he had never experienced such difficulty with a seller's broker in his career, and advised Plaintiff to retain her own listing agent.

34. On or about April 25, 2017, Plaintiff retained her own listing agent to facilitate the negotiations with Haynes for the purchase of the Apartment.

35. On or about April 26, 2017, Haynes provided Plaintiff with a detailed financial questionnaire form requesting additional information about Plaintiff's finances, on grounds that the Condominium required the information.

36. However, Plaintiff soon discovered that the Condominium did not use or require the questionnaire or information that Haynes demanded from Plaintiff.

37. On or about May 3, 2017, Plaintiff increased her offer to $450,000 and submitted a formal loan commitment letter for financing in the amount of the increased offer, but received no response from Haynes.

38. Haynes continued to show the Apartment, and on those occasions that Plaintiff and Teka were present, Haynes requested that they both wait outside the Apartment during the showings or that only one of them remain in the Apartment during the showings.

39. Haynes further made insulting comments towards the Plaintiff and her fiancée in an email to Plaintiff and Seller, who had not been aware of the Plaintiff's sexual orientation.

40. On or about May 9, 2017, Plaintiff increased her offer to $470,000, to which Plaintiff never received a response.

41. About two weeks later, Plaintiff learned that Seller had accepted an offer from another prospective buyer, Barry Minkin, to purchase the Apartment.

42. Upon information and belief, the Apartment was sold in or about July 21, 2017 to Barry Minkin and Christina Verrastro.

43. On or about October 31, 2017, Plaintiff and Teka moved out of the Apartment.

## FIRST CAUSE OF ACTION

### Fair Housing Act, 42 U.S.C. §§ 3601-3619, 3631

44. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraph 1- 43 above.

45. Defendants have violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, by discriminating against Plaintiff on the basis of sex, sexual orientation, gender, and/or familial status in connection with the sale and availability of the Apartment.

46. At all times relevant to this action, Plaintiff was and is in a domestic relationship with her fiancée, Teka.

47. At all times relevant to this action, Plaintiff resided in the subject Apartment with her fiancée, Teka.

{1455-0001/00028176-2}                                      6

48. At all times relevant to this action, Defendants' business included engaging in residential real estate-related transactions, as such term is defined in 42 U.S.C. 3605(b).

49. The Apartment is a "dwelling" within the meaning of 42 U.S.C. 3602(b).

50. Plaintiff applied for the purchase of the Apartment and made several *bona fide* offers to purchase the Apartment.

51. Plaintiff was financially qualified to purchase the Apartment, having obtained financing preapproval and a commitment for financing, *inter alia*.

52. After learning of Plaintiff's sexual orientation, Defendant Haynes made comments about religion to Plaintiff and her female fiancée, and refused to permit interaction between the couple and Haynes' two-year-old daughter, who attended the initial Apartment visit in early March with Haynes.

53. After learning of Plaintiff's sexual orientation, Haynes demanded that Plaintiff and her female fiancée wait outside the Apartment during the open houses.

54. After learning of Plaintiff's sexual orientation, Haynes created significant barriers to Plaintiff's purchase of the Apartment by, inter alia:

   a. Refusing to consider or accept Plaintiff's *bona fide* offers to purchase the Apartment;

   b. Requesting unduly burdensome and unnecessary financial information from the Plaintiff;

   c. Failing to return Plaintiff's phone calls, emails and text messages in connection with the purchase of the Apartment;

   d. Imposing unnecessary conditions on Plaintiff for the purchase of the Apartment;

 e. Interfering with Plaintiff's mortgage application in order to undermine Plaintiff's financing approval;

 f. Improperly inquiring about Plaintiff's finances from Plaintiff's mortgage broker;

 g. Arbitrarily changing the terms of the Seller's initial counteroffer after Plaintiff increased her first *bona fide* offer;

 h. Misrepresenting to Plaintiff that Seller was seeking all-cash buyers when, in fact, the property listing did not contain an all-cash requirement; and

 i. Misrepresenting to Plaintiff that the Condominium was only eligible for financing to buyers with high net worth.

55. Defendant Halstead knew or should have known of Haynes' aforementioned discriminatory conduct, and by its acts and/or omissions, participated, acquiesced, condoned, or otherwise ratified Haynes' discriminatory conduct.

56. Defendants' interference with and denial of Plaintiff's purchase of the Apartment prevented Plaintiff from purchasing the Apartment even though she had consistently paid her rent on time during the duration of her tenancy, complied with her obligations, and was an overall model tenant who was financially qualified to purchase the property.

57. Defendants' continued interference and misconduct made Plaintiff's continued tenancy at her Apartment more burdensome and significantly less desirable than were the interference and misconduct not occurring.

58. Defendants' conduct was intentional, willful, and taken in disregard of the protected rights of Plaintiff.

59. Defendants' interference with and denial of Plaintiff's purchase of the Apartment was motivated by a discriminatory intent and resulted in disparate treatment of a protected class on the basis of sex, sexual orientation, gender, and/or familial status, as Plaintiff and her female fiancée did not conform to Haynes' traditional notions of gender and family, and contradicted Haynes' beliefs and gender stereotypes.

60. Defendant Halstead failed to take reasonable or corrective measures to address or cure the discriminatory conduct of Defendant Haynes.

61. Defendant Halstead is liable for the discriminatory conduct of its agent, Ayo Haynes, as Defendant Halstead knew or should have known of the discriminatory conduct of Haynes, yet failed to take reasonable or corrective measures.

62. Defendants' aforementioned conduct, *see supra at* ¶¶ 46-54, and ¶ 60 constitutes:

   a. A denial of housing or making housing unavailable because of sex, sexual orientation, gender, and/or familial status, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

   b. Discrimination in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services or facilities in connection therewith, because of sex, sexual orientation, gender, and/or familial status, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b);

   c. The making of statements with respect to the sale of a dwelling that indicate a preference, limitation, or discrimination based on sex, sexual orientation, gender, and/or familial status, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c);

  d. Unlawful discrimination in making available a residential real estate-related transaction, or in the terms and conditions of such transaction, on the basis of sex, sexual orientation, gender, and/or familial status, in violation of Section 805 of the Fair Housing Act, 42 U.S.C. § 3605(a); and

  e. Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged another person in the exercise or enjoyment of, their rights under Section 804 of the Fair Housing-Act, in violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617.

63. The Defendants' conduct described above also constitutes a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601, et seq. and/or a denial to a group of persons of rights granted by the Fair Housing Act, 42. U.S.C. §§ 3601, et seq., which denial raises an issue of general public importance.

64. Defendants' interference with and denial of Plaintiff's purchase of the Apartment was motivated by a discriminatory intent and resulted in disparate treatment of a protected class on the basis of sex, sexual orientation, gender, and/or familial status.

65. Due to Defendants' discriminatory acts, Plaintiff has suffered pecuniary losses, consequential damages, embarrassment, emotional and mental anguish, and the deprivation of her civil rights to purchase the apartment.

66. Pursuant to 42 U.S.C. § 3613(c)(l), Plaintiff is entitled to damages in a sum to be ascertained for the injuries caused by the discriminatory conduct.

67. Plaintiff is entitled to compensatory damages, consequential damages, mental anguish, pain and suffering damages in an amount no less than $250,000.00, as well as an award of reasonable attorney's fees, expenses and costs.

68. Defendants' intentional and wanton misconduct and reckless disregard of the requirements of the law also warrant punitive damages, in an amount no less than $500,000, in that, despite conclusive evidence that Plaintiff was qualified and able to purchase the Apartment, Defendants refused to sell the apartment to the Plaintiff on various pretextual bases.

## SECOND CAUSE OF ACTION

### New York State Human Rights Law, N.Y. Exec. Law § 296(5)

69. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70. By denying and interfering with the Plaintiff's opportunity to purchase the Apartment, Defendants have:

   a. otherwise denied or withheld housing accommodations because of sexual orientation in violation of the Human Rights Law, N.Y Exec. Law § 296(5)(a)(1); and

   b. discriminated in the terms, conditions, or privileges of the rental of housing accommodations because of sexual orientation in violation of the Human Rights Law. N.Y. Exec. Law § 296(5)(a)(2).

71. Defendant Halstead knew or should have known of Haynes' aforementioned discriminatory conduct, and by its acts or omissions, participated, acquiesced, condoned, or otherwise ratified Haynes' discriminatory conduct.

72. Defendants have violated the New York State Human Rights Law by maintaining and enforcing its discriminatory policies and practices, as described herein. Defendants have refused to consider or accept Plaintiff's *bona fide* offers, increased offers and counteroffers, regardless of borrower creditworthiness or financing ability; instructed Plaintiff and her fiancée to not be present at the Apartment during an open house; altered the terms of the sale of the Apartment; improperly inquired about Plaintiff's finances from Plaintiff's mortgage broker; and falsely informed Plaintiff that seller was seeking all-cash buyers when the property listing did not contain an all-cash requirement.

73. Defendants' interference with and denial of Plaintiff's purchase of her rental apartment was motivated by a discriminatory intent and resulted in disparate treatment on the basis of sexual orientation.

74. Defendants' unlawful discriminatory practices have aggrieved and already caused injury to Plaintiff.

75. Plaintiff is entitled to damages in a sum to be ascertained for the injuries caused by the unlawful discriminatory conduct.

76. Due to Defendants' discriminatory acts, Plaintiff has suffered pecuniary losses, consequential damages, embarrassment, emotional and mental anguish, and the deprivation of her civil rights to purchase the Apartment.

77. Plaintiff is entitled to compensatory damages, consequential damages, mental anguish, pain and suffering damages in an amount no less than $250,000.00, as well as reasonable attorney's fees, expenses and costs.

78. Defendants' intentional and wanton misconduct and reckless disregard of the requirements of the law also warrant punitive damages, in an amount no less than $500,000, in

that despite conclusive evidence that Plaintiff was qualified and able to purchase the Apartment, Defendants refused to sell the Apartment to the Plaintiff on various pretextual bases.

### THIRD CAUSE OF ACTION

### New York City Human Rights Law, New York City Administrative Code, Title 8 Section 8-107(5)(a)(1)

79. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in all foregoing paragraphs as if set forth fully herein again at length.

80. Defendant Halstead knew or should have known of Haynes' aforementioned discriminatory conduct, and by its acts or omissions, participated, acquiesced, condoned, or otherwise ratified Haynes' discriminatory conduct.

81. Defendants' policies, practices, acts, and/or omissions were discriminatory in nature, resulting in disparate treatment and disparate impact to the detriment of a member of a protected class in New York City.

82. Defendants' aforementioned conduct constitutes discrimination on the basis of sexual orientation with regards to the sale of a housing accommodation.

83. The Plaintiff is a member of a protected class on account of her sexual orientation, sex, and/or family status.

84. Plaintiff was qualified to purchase and properly expressed her desire to purchase the Apartment.

85. Defendants denied Plaintiff's offers and counteroffers to purchase the Apartment for illegitimate and discriminatory reasons based on Plaintiff's sexual orientation, sex, and/or family status.

86. Defendants' demand for invasive financial details was illegitimate and discriminatory, as Plaintiff made multiple reasonable offers consummate with the fair market value of the Apartment and the financial status of the Condominium did not pose obstacles to Plaintiff's ability to finance the Apartment.

87. Defendants' conduct was discriminatory and illegitimate, as Defendants requested that Plaintiff and her female fiancée not be present at the Apartment during an open house, changed the terms of the sale of the Apartment after learning of Plaintiff's sexual orientation and living arrangements, improperly inquired about Plaintiff's personal and private financial state from Plaintiff's mortgage broker, and informed Plaintiff that seller was seeking all-cash buyers when the property listing did not provide for an all-cash requirement.

88. As a direct consequence of this discrimination, Plaintiff has suffered pecuniary losses, consequential damages, humiliation, mental and emotional anguish, and the deprivation of her civil rights.

89. Plaintiff is entitled to compensatory damages, consequential damages, mental anguish, and pain and suffering damages in an amount no less than $250,000.00, as well as reasonable attorney's fees, costs and expenses.

90. As a result of Defendants' actions, Plaintiff has lost the opportunity to purchase the apartment.

91. Defendants' intentional and wanton misconduct and reckless disregard of the requirements of the law also warrant punitive damages, in an amount no less than $500,000, in that despite conclusive evidence that Plaintiff was qualified and able to purchase the Apartment, Defendants refused to sell the Apartment to the Plaintiff on various pretextual bases.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter a judgment and order:

A. On the First, Second, and/or Third Causes of Action, declaring that the subject acts, omission, and/or practices of Defendants constitute violations of the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law;

B. On the First, Second, and/or Third Causes of Action, enjoining Defendants, their agents, employees, and successors, and all other persons in active concert or participation with Defendants, from:

    1. Discriminating on account of sexual orientation in any aspect of its real estate business practices;

    2. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiff to the position she would have been in but for the discriminatory conduct; and

    3. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any such discriminatory conduct in the future; to eliminate, to the extent practicable, the effects of Defendants' unlawful practices; and to implement policies and procedures to ensure that all Defendants' customers and clients are served without regard to protected characteristics;

C. Awarding monetary damages to compensate for the harm done to Plaintiff due to Defendants' discriminatory policies and practices, in an amount no less than $250,000.00, pursuant to 42 U.S.C. § 3613, N.Y. Exec. L. § 297(9), and the New York City Human Rights Law;

D. Assessing civil fines or penalties against Defendants in an amount authorized by N.Y. Exec. L. § 297 (9), for Defendants' willful, wanton, and malicious conduct;

E. Awarding punitive damages against Defendants in an amount no less than $500,000.00 pursuant to 42 U.S.C. § 3613(c)(1) and N.Y. Exec. L. § 297(9);

F. Awarding Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2), New York State Human Rights Law, and the New York City Human Rights Law; and

G. Awarding such other and further relief as this Court may deem appropriate and as may be required in the interests of justice.

Dated: June 15, 2018

WAGNER BERKOW, LLP

By: _____
Ian J. Brandt, Esq. – BR 9581
1410 Broadway – 23rd Floor
New York, New York 10118
(646) 791-2086
ijbrandt@wagnerberkow.com
*Attorneys for Plaintiff*