UNITED STATES DISTRTRIC COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE,

                                Plaintiff,

         -against-

HALSTEAD PROPERTY, LLC, HALSTEAD
MANHATTAN, LLC, and AYO HAYNES

                             Defendants.

1:18-cv-05436-AKH-DF


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS
MOTION FOR PRECLUSIONS AND SANCTIONS**


WAGNER, BERKOW & BRANDT, LLP
*Attorneys for Plaintiff*
462 7th Avenue, 6th Floor
New York, New York 10018
646-780-7272


Of Counsel:
Ian J. Brandt

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ………………………………………………………… 1

**FACTS** ……………………….…………………………………..…………… 3

**LEGAL ARGUMENT** …………………………………………………….…....... 10

        **POINT I**      **PLAINTIFF HAS ESTABLISHED A
PRIMA FACIE CASE FOR HOUSING
DISCRIMINATION AND**
MATERIAL **ISSUES OF FACT
WARRANTING A TRIAL**………………………………… 10

        **POINT II**     **PLAINTIFF'S CROSS-MOTION TO
PRECLUDE AND FOR SANCTIONS
UNDER FRCP 37 SHOULD BE
GRANTED DUE TO DEFENDANTS'
FAILURE TO TURN OVER RESPONSIVE
DOCUMENTS IN DISCOVERY**................................................... 25

**CONCLUSION** ………………………………………………………..………… 36

## **TABLE OF AUTHORITIES**

**Cases**

*3801 Beach Channel, Inc. v. Shvartzman*, No. 05-CV-207 (CBA) (JO), 2007 U.S. Dist.
LEXIS 72788, 2007 WL 2891119 (E.D.N.Y. Sept. 28, 2007)…………………………   30

*Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298 (2d Cir. 2009) ……………………   25,32

*Anthropologie, Inc. v. Forever 21, Inc.*, No. 07 Civ. 7873 (RJS) (MHD), 2009 U.S. Dist.
LEXIS 20908, 2009 WL 690126 (S.D.N.Y. Mar. 13, 2009)………………………………   31

*Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849 (2d Cir. 1995)……………………   30,32

*Broome v. Biondi*, 1997 US Dist LEXIS 17349, SDNY Nov. 4, 1997,
96 Civ. 0805 (RLC)……………………………………………………………………   12,13

*Cine-Forty Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
602 F.2d 1062 (2d Cir. 1979)…………………………………………………………….   31

*Doug's Word Clocks.Com Pty. Ltd. v Princess Intl., Inc.*,
323 FRD 167 (SDNY 2017)……………………………………………………………   27-29, 31

*Drywall Tapers, Local 1974 v. Local 530 Fujitsu Ltd. v. Fed. Exp. Corp.*,
247 F.3d 423 (2d Cir. 2001)……………………………………………………………..   24, 26

*Hawley, Id.* (*Hawley v Mphasis Corp.*, 302 FRD 37 (SDNY 2014)……………………   25

.
*Hubbard v Samson Mgt. Corp.*, 994 F Supp 187, 187 (SDNY 1998).  …………….......   10

*Mancuso v Douglas Elliman, LLC*, 808 F Supp 2d 606 (SDNY 2011)…………………   11

*McDonnell Douglas Corp. v. Green*………………………………………………….   11

*Mitchell v Shane*, 350 F3d 39 (2d Cir 2003)………………………………………   10, 11, 17

*Nieves v. City of New York*, 208 F.R.D. 531 (S.D.N.Y. 2002)…………………………..   30

*Ocello v. White Marine, Inc.*, 347 F. App'x 639 (2d Cir. 2009)………………………..   32

*Odyssey Mar. Exploration, Inc. v Shipwrecked & Abandoned SS Mantola*,
2019 US Dist LEXIS 200891 (SDNY Nov. 19, 2019)…… …………………………   26

*Operative Plasterers and Cement Masons Int'l Ass'n*, 889 F.2d 389  (2d Cir. 1989)……   24

*Passanante v R.Y. Mgt. Co.*, 2001 US Dist LEXIS 1205 (SDNY Feb. 9, 2001)…………….   13

*PSG Poker, L.L.C. v. DeRosa-Grund*, No. 06 CIV. 1104 (DLC),
2008 U.S. Dist. LEXIS 4225, 2008 WL 190055 (S.D.N.Y. Jan. 22, 2008)…………..…… 28, 29

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999*)*…………………………. 26

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
306 F.3d 99 (2d Cir. 2002)…………………………………………………………….. 24, 29

*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979)…………………………. 13

*Transatlantic Bulk Shipping Ltd. v. Saudi Chartering S.A.*, 112 F.R.D. 185
(S.D.N.Y. 1986)………… ……………………………………………………………… 24

*United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091
(2d Cir. 1995)…………………………………………………………………………… 24

*Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67 (2d Cir. N.Y. 1988)……………… 33

*Yeshiva Chofetz Chaim Radin, Inc. v Vil. of New Hempstead*,
98 F Supp 2d 347 (SDNY 2000)..………………………………………………………….. 10

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018)………………………….. 12

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ………...………….. 25

**Statutes:**

42 U.S.C.. § 3604(a)……………………………………………………………………… 10
.
42 U.S.C. § 3604(b).  ……………………………………………………………….. 10

42 U.S.C.S. § 3605 ……………………………………………………………………….. 10

FRCP 37(c)……………………………………………………………………….…… 23

FRCP 37(c)(1)……………………………………………………………………………… 23

FRCP 26(a)…………………………………………………………………………… 23

FRCP 26(a)(1)(A)(ii)……………………………………………………………………….. 26

Fed. R. Civ. P. 37(b)(2)………………………………………………………………. 24

Fed. R. Civ. P. 37(b)(2)(A). ………………………………………………………………… 25

Fed. R. Civ. P. 56(c)……………………………………………………………………. 9

## PRELIMINARY STATEMENT

This memorandum of law is submitted by Plaintiff Jane Doe a/k/a Geannetta Jackson[1] in opposition to Defendants' motion for summary judgment seeking to dismiss Plaintiff's Complaint, and in support of her FRCP 37 cross-motion to preclude Defendants' evidence for their failure to comply with discovery and for sanctions.

This is an action for housing discrimination under the Federal Fair Housing Act, and the analogous human rights laws of New York State and New York City.  Plaintiff alleges that, while financially qualified, she was denied an opportunity to negotiate the purchase of a condominium unit which she had been renting for the previous five years, due to the interference of the real estate broker, Defendant Ayo Haynes ("Haynes"), representing the then-owner of the unit, which interference was motivated, at least in part, by a discriminatory animus against plaintiff because she is a lesbian. Procedurally, the parties have engaged in paper discovery and have completed party depositions.

Defendants' motion for summary judgment seeks dismissal of the Complaint based on the conjecture that Plaintiff was simply outbid by an all-cash buyer for the condominium apartment. However, Defendants overlook the simple truth that Plaintiff was not afforded the opportunity to fully participate in the bidding process. The record reflects that Defendant Ayo Haynes imposed impediments and barriers to Plaintiff's attempts to negotiate the purchase of the apartment almost every step of the way.

Plaintiff, who is a lesbian, can show that she was treated differently than others similarly situated even though she was qualified to purchase the apartment.  For example, Haynes refused

---

[1] Plaintiff hereby relinquishes the privilege of proceeding under the pseudonym, "Jane Doe," and voluntarily wishes to proceed under her actual name, Geannetta Jackson. *See* accompanying declaration of Geannetta Jackson.

to submit Plaintiff's bids for consideration to the seller, Champel, until Plaintiff could demonstrate that she was guaranteed to obtain bank financing, even though Plaintiff, an attorney with stellar credit scores, had been the tenant of the Apartment for five years, had always paid her rent on time, and had been a model tenant; and notwithstanding that she had presented preapproval letters and even a "conditional commitment" for financing.  Defendants assert that all prospective buyers were subject to the same conditions and requirements prior to submission of their bids to the sellers; however, Defendants have refused to produce the documents in discovery supporting this argument, notwithstanding Defendants' repeated representations that such documents exist. Defendants therefore should be precluded from introducing evidence of a spreadsheet (*see* Defendants' Exhibit "**H**") of the bidders because Defendants did not turn over any communications evidencing the bids and from which the spreadsheet was created, notwithstanding that Haynes attested in her deposition that she had (has) those documents.

Plaintiff's cross-motion seeks sanctions under FRCP 37 relating to numerous discovery violations and Defendants' repeated refusals to provide documents requested by the Plaintiff, namely all communications with the bidders for the apartment as identified on Defendants' Exhibit "H" and all REBNY forms that Haynes claims the bidders submitted to her.  Plaintiff's cross-motion seeks the following relief:  (a) for an adverse inference against Defendants that Haynes did not demand the submission of REBNY forms or any other financial information from any bidders, other than Plaintiff (b) an adverse inference that Haynes did not solicit or receive any bids higher than $485,000, the price the apartment was actually sold for; (c) an order precluding Defendants from introducing into evidence the bid spreadsheet alleged to have been prepared by Haynes and identified as Defendants' Exhibit "H"; (d) an order precluding Defendants from introducing into evidence or at trial any evidence or testimony that Haynes asked for or demanded financial

information from any other prospective bidder for the Apartment; (e)   an order striking Defendants' answer; (f) directing Defendants to reimburse Plaintiff's reasonable attorneys' fees in connection with defendants' failure to comply with court-ordered discovery; and (e) such other and further relief as the Court deems just and proper.

## FACTS

Plaintiff respectfully refers the Court to the Declaration of Geannetta Jackson dated March 17, 2020, the Declaration of Ian J. Brandt, Esq. dated March 17, 2020, and to Plaintiff's Responses to Defendants' Statement of Material Facts dated March 17, 2020 for a complete recitation of the facts at issue.  For the Court's convenience, a summary of pertinent facts is set forth below:

Plaintiff, a homosexual woman, brings claims against Defendants Halstead Manhattan, LLC f/k/a Halstead Property, LLC, and Ayo Haynes, a broker with Halstead during the time period relevant to this action (collectively the "Defendants"), for discrimination under the Fair Housing Act and New York City and State Human Rights Law on the basis of gender, familial status and/or sexual orientation in connection with Plaintiff's attempts to purchase her rental apartment, condominium Unit #4 (the "Apartment") in the condominium building known as the Harlem Sol Condominium located at 123 West 131st Street,  in Harlem, NYC.  Upon learning of Plaintiff's co-habitation with her female fiancée, Shateka ("Teka") Barnes, Defendant Haynes intentionally and unjustifiably interfered with her efforts to purchase the apartment in which she had been renting for 5 years, notwithstanding Plaintiff's multiple bona fide offers, her procurement of financing, and the seller's stated desire to sell her the apartment on a priority basis.

Plaintiff was financially qualified to purchase the apartment.  She was pre- approved by multiple banks for financing for the Apartment in amounts up to $470,000 (see Exhibit 28).  Moreover, her mortgage broker, Antwan "AJ" Johnson, attests that she would have qualified for

additional financing, if were needed to fund the purchase of the Apartment in order to outbid Barry

Minkin, the actual purchaser. *See* Declaration of AJ Johnson at ¶¶ 12-13. In fact, in connection

with another residence she later sought to purchase (after losing the opportunity to purchase the

Apartment), Wells Fargo authorized a loan of $495,000 on a purchase price of $550,000. *See* Exh.

28.

Hence, Defendant's main argument for summary judgment, that Plaintiff was simply

outbid, is a tissue of lies.  Haynes refused to transmit Plaintiff's bids to Champel.  Among other

things, Haynes:

a.   Failed to submit all of Plaintiff's bids to Champel;

b.   Falsely claimed the apartment was being offered to all-cash buyers only and refused to submit or consider Plaintiff's bids until after all-cash offers had been obtained;

c.   Falsely informed Plaintiff's real estate broker (whom Plaintiff engaged after it was clear that Haynes did not want to negotiate with Plaintiff) that he had no right to submit an offer on Plaintiff's behalf because Haynes herself was entitled to the entire six percent (6%) commission pursuant to the alleged requirements of Plaintiff's rental agreement;

d.   Improperly questioned Plaintiff's mortgage broker about Plaintiff's abilities to obtain financing and inquired into her maximum financing ability;

e.   Questioned Plaintiff's financial qualifications - even though Haynes previously admitted that Plaintiff's credit scores were stellar and despite the fact that she had been a model tenant for years - and expressed doubts to Champel  about Plaintiff's ability to obtain bank financing, notwithstanding that Plaintiff had bank preapprovals and ample evidence to establish sufficient financing;

f.   Insisted that Plaintiff provide her with detailed REBNY financial disclosures and submit to other requirements apart from and separate from Plaintiff's bank preapprovals before she would transmit Plaintiff's offer(s) to Champel, notwithstanding that Haynes subjected no other prospective purchasers of the Apartment to the same requirements;

g.   Insisted that Plaintiff obtain a financing commitment prior to submitting her bids to the seller, notwithstanding that no bank would ever issue a commitment until after a contract of sale is executed;

h.   Falsely claimed that banks would find it difficult to fund purchases of units in the building due to the condominium's financials and other factors when, in fact, a unit in the building was financed by a bank with similar condominium financials and

other factors approximately one year prior (see Exh. 26, Haynes Dep. Tr., 124:18-25; 125:2-6);

i.   Disparaged plaintiff to the Condominium's board of managers by accusing Plaintiff of being the reason for a post-contract reduction in the purchase price of the apartment to Barry Minkin, when, in fact, the reason the purchase price was reduced was due to Haynes' misrepresentations about the terms of Plaintiff's lease;

j.   Asked that Plaintiff and her female fiancée leave the Apartment during open houses and falsely accusing Plaintiff of being in default of her lease agreement.

As a result of Haynes' interference, Plaintiff was denied the opportunity to purchase the Apartment despite the fact that she was financially qualified to do so.

Defendants contend that Plaintiff was not treated any differently than any other bidder for the Apartment.[2]   Defendant Haynes asserts that she requested and received detailed financial forms from each bidder for the aApartment, including from the successful bidder (and subsequent purchaser) Barry Minkin.   *See* Haynes Dep. Tr., 120:25; 121:2-20, Exhibit 26.   Defendants also identified the names of several bidders for the Apartment, along with their respective offer amounts.[3]  *See* Defendants' Response to Plaintiff's Interrogatory No. 5, Defendants' Reponses to Plaintiff's First Set of Interrogatories dated 3/5/19, annexed as Exhibit 27.   Defendant Haynes confirmed during her deposition that she asked for a detailed financial form from each bidder for the Apartment, and that she received the completed financial forms from each of the same. See Haynes Dep. Tr., 134:15-22, 120:25; 121:2-14, Exhibit 26.

Plaintiff first requested documents related to offers made for the Apartment back in January 2019, in the early ages of discovery.   See Plaintiff's First Request for Production of Documents dated January 31, 2019, Demand Nos. 13, 15, 16, 27, annexed as Exhibit 28.   Defendants have yet

---

[2] Haynes stated that with respect to Plaintiff and, "I didn't ask any other questions that were different from another purchaser." Transcript from deposition of Ayo Haynes taken December 23, 2019, 194:10-12, Exhibit "26".

[3] In fact, Defendants identified at least one of the offers by date and time, thereby indicating the existence of documents underlying such bids.

to produce the requested documents, despite the identification of the same in defendants' interrogatory responses and by Haynes' deposition testimony.  Defendants initially indicated that the documents in question would be available for inspection (see Exh. 29, Defendants' Responses to Plaintiff's First Request for Production of Documents dated March 5, 2019, p. 13), but no responsive documents were produced to Plaintiff.  In July 2019, Defendants finally did produce responsive paper documents, but only after Plaintiff wrote to the Court seeking intervention as a result of the same (see Letter Motion to Compel, which was ultimately denied without prejudice due to improper form, ECF Document No. 25).   Further, the documents that were provided to Plaintiff in July 2019 were incomplete, in that, among other things, they did not include email correspondences.  When said email correspondences were finally produced by Defendants in November 2019, conspicuously absent were any of the requested communications with bidders for the Apartment or relating to offers made for the Apartment.  Defendants' counsel ignored subsequent requests for the outstanding documents.

During her December 23, 2019 deposition, Haynes testified that she asked for, and received, REBNY forms for each of the bidders for the apartment:

> **Q**:  "[F]or each of the offers that you received following the open house, …
> did you ask the buyers to submit to you a completed financial REBNY
> form?"
>
> **A**: "Yes."
>
> **Q**:  Did they submit those forms?
>
> **A**:  Yes.
>
> (Haynes Dep. Tr., 134:15-22)

In fact, Haynes confirmed that she asked for and received financial documents from Mr. Minkin and Ms. Verrastro, the eventual purchasers of the Apartment:

> Q:  At the time that Mr. Minkin and Ms. Verrastro…made their initial offer, did you ask for any documentation from either both of them about their financial qualifications?
>
> A:  Through their agent, yes
>
> Q:  What kind of information did you request?
>
> A:  The same I requested of Ms. Doe the [sic] form from the Real Estate Board of New York.  And because they were paying all cash, I did request a letter from their financial advisor attesting to the fact they can pay all cash.
>
> Haynes Dep. Tr., 120:25; 121:2-14, Exhibit 26.

During her deposition, Haynes also testified to the amounts of certain bids and indicated that there were records of these offers.  See Exh. 26, Haynes Dep. Tr., 132:5-11 (wherein Haynes confirmed a written offer for $480,000).

Haynes' testimony during her deposition prompted plaintiff's counsel to call for the production of all such documents identified by Haynes.  Counsel for defendants advised that said request would be "taken under advisement" and objected to the production of third-party financial forms to the extent they contained private financial information.  Neither Haynes nor her counsel indicated that the underlying bid documents did not exist or that the offers were conveyed only verbally.

Counsel for plaintiff followed up with a request for the outstanding documents by email on January 7, 2020, and again on January 8, 2020.  Annexed as **Exhibit 30** is a string of email

correspondences between Mr. Saulitis and Plaintiff's counsel concerning the outstanding documents at issue. Mr. Saulitis responded on January 9, 2020 (on the eve of an in-court status conference). *See* Exhibit 30**.** Defendant's supplemental responses consisted of a mere 10 pages of additional documents, including a PDF of unknown origin which appeared to contain a list of bidders for the Apartment along with bid amounts[4] and which Defendants later asserted came from an Excel spreadsheet produced by Haynes based solely on verbal information communicated to her (the "Bid Sheet"). A copy of the Bid Sheet is annexed to Defendants' motion for summary judgment as **Exhibit H**. This document did not identify who had created it and contained no further information. The remaining portion of the supplemental production consisted of a blank purchase application which was said to have come from the condominium's managing agent's purchase application. Absent from this production were forms completed by any of the prospective purchasers of the Apartment identified by Defendants in their previously produced discovery, and related email communications between defendants and the bidders. With respect to the missing financial forms, Mr. Saulitis suggested that plaintiff "may wish to obtain completed applications from managing agent." (see Exhibit 30).

At the January 19, 2020 Court's status conference, Plaintiff's counsel raised the issue of the PDF Bid Sheet and Defendants' failure to produce any of the underlying documents or communications from which the Bid Sheet was derived. Mr. Saulitis, for the first time, asserted that the document in question was generated from a spreadsheet created by Haynes based solely on verbal information (see Declaration of Ian J. Brandt dated March 17, 2020 ("Brandt Declaration")), notwithstanding Defendants' interrogatory responses and despite Ms. Haynes'

---

[4] It should also be noted that in his email response, defendants' counsel stated that he had previously produced the PDF in question as an Excel spreadsheet, however, this was never the case.

own deposition testimony to the contrary when she testified that she had received a written offer for $480,000 (Haynes Dep. Tr., 132:5-7, Exhibit 26).

The Court directed that the underlying documents used by Haynes to create the Bid Sheet must be produced by January 24, 2020 and advised Mr. Saulitis that if those documents were not disclosed, the information contained in the Bid Sheet could not be used in the litigation. *See* Brandt Declaration, ¶ 14.

On or about January 17, 2020, having still not received any responsive documents, Plaintiff's counsel wrote to Mr. Saulitis inquiring as to the status of the outstanding request.  See Exhibit 30. On January 18, 2020, Mr. Saulitis responded, this time attaching the underlying Excel file of the Bid Sheet (for the first time, notwithstanding Mr. Saulitis' claims to the contrary). Mr. Saulitis further stated that the Bid Sheet was "compiled from verbally-obtained information and not from documents, to manage the bidding process in real time".  See Exhibit 30.  In response to the outstanding demand for financial forms which Ms. Haynes testified she had asked each for and received from each bidder (see Haynes Dep. Tr., 134:15-22, 120:25; 121:2-20, Id.), Mr. Saulitis stated as follows:

> "To ascertain the financing criteria, you would need to subpoena the lenders, as this is not information to which a selling broker would be privy, or entitled to, and which we wouldn't (and don't) have."

See Exhibit 30.

Notwithstanding the fact that defendants' counsel by his very own statement admits that it would be improper for a selling broker to ask for detailed financial information from  a prospective purchaser – essentially the very conduct engaged in by Ms. Haynes in this case – Mr. Saulitis' response contradicts Ms. Haynes deposition testimony wherein she affirmed that she asked for and

received financial forms from each bidder for the Apartment.  *See* Haynes Dep. Tr., 134:15-22, 120:25; 121:2-20.

In an attempt to resolve the outstanding requests, plaintiff's counsel wrote to Mr. Saulitis on January 22, 2020 and even offered to accept redacted financial information to resolve defendants' alleged privacy concerns.  Defendant never responded to this communication, and Defendants produced no further responsive documents to Plaintiff, despite the Court-ordered deadline of January 24, 2020.

## LEGAL ARGUMENT

## POINT I

## PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE FOR HOUSING DISCRIMINATION AND MATERIAL ISSUES OF FACT WARRANTING A TRIAL

A motion for summary judgment should only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court's responsibility is to perform the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities in the light most favorable to, and draw all reasonable inferences in favor of, the party opposing the motion.  *Hubbard v Samson Mgt. Corp.*, 994 F Supp 187, 187 (SDNY 1998).

In evaluating whether a genuine issue of material fact exists, the evidence of the non-movant is to be believed, and a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. On a motion for summary judgment, a court cannot try issues

of fact; it can only determine whether there are issues to be tried. Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted. *Yeshiva Chofetz Chaim Radin, Inc. v Vil. of New Hempstead*, 98 F Supp 2d 347, 349 (SDNY 2000). In the context of housing discrimination cases, summary judgment is appropriate, only if no reasonable jury could find that the defendant's actions were motivated by discrimination

A.   **Plaintiff has established a prima facie case of housing discrimination.**

The Fair Housing Act, 42 U.S.C.S. § 3601 et seq., makes it unlawful to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin. 42 U.S.C.S. § 3604(a). Likewise, property owners and their agents may not unlawfully discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling. 42 U.S.C.S. § 3604(b). *Mitchell v Shane*, 350 F3d 39, 41 (2d Cir 2003).

§ 3605 of the Fair Housing Act provides that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." Residential real estate-related transactions include "the selling, brokering, or appraising of residential real property".

Plaintiff, a lesbian, has established sufficient facts for a reasonable jury to conclude that Haynes, a residential real estate broker, discriminated against her by refusing to negotiate for the sale of the Apartment because of plaintiff's sexual orientation. Further, facts also establish that Haynes discriminated against plaintiff in the making available the transaction in question (i.e. the

attempted purchase of the Apartment) and in the terms and conditions of the transaction, in that Haynes subjected plaintiff to unduly burdensome and improper demands to which other prospective purchasers were not subjected.

Claims of housing discrimination, whether under Federal Fair Housing Act, New York State Human Rights Law or New York City Human Rights Law, are all evaluated under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*. *See Elmowitz v. Executive Towers at Lido, LLC,* 571 F. Supp. 2d 370, 376 (E.D.N.Y.2008). A plaintiff must first establish a *prima facie* case of housing discrimination by showing: (1) that she is a members of a protected class; (2) that she sought and was qualified to rent or purchase the housing; (3) that she was rejected; and (4) that the housing opportunity remained available to other renters or purchasers.

Once a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision. If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action. Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination, in whole or in part. *Mancuso v Douglas Elliman, LLC*, 808 F Supp 2d 606, 609 (SDNY 2011); *see also Mitchell v Shane*, 350 F3d 39, 41 (2d Cir 2003) (denying broker's motion for summary judgment because issues of fact remained as to whether defendant real estate broker's failure to permit plaintiff to bid on house constituted racial discrimination in violation of FHA where African American couple lost opportunity to purchase Hamptons home after contract of sale was awarded to another purchaser but where seller's broker failed to notify plaintiffs of the higher offer).

A plaintiff raises an inference of unlawful housing discrimination when he establishes a prima facie case. *Broome v. Biondi*, 1997 US Dist LEXIS 17349, at *1 [SDNY Nov. 4, 1997, 96 Civ. 0805 (RLC), 96 Civ. 2262 (RLC)].

Here, not only can Plaintiff readily establish a *prima facie* case, but Defendants have no conclusive legitimate, non-discriminatory explanation to rebut the *prima facie* case. Defendants offer no conclusively legitimate explanation for Haynes' refusals to transmit Plaintiff's bids, for her interference with Plaintiff's financing, for claiming that both Plaintiff's lender and the Condominium had financial requirements that Haynes first needed to vet, or for failing to provide Plaintiff with a counteroffer after Plaintiff's multiple bids. Defendants argue that Haynes had a fiduciary obligation to Champel to procure the best possible resale price for the Apartment. There is no dispute that real estate brokers have obligations to their clients to procure the best possible resale price. However, that is not the issue before the Court. Haynes also had an obligation to transmit Plaintiff's offers to Champel. Haynes repeatedly impeded Plaintiff's ability to do so, and without a single legitimate explanation. Haynes repeatedly tried to steer Champel away from Plaintiff as evidenced by her demands for financial information about Plaintiff, which were not demanded from other bidders. Haynes prevented Plaintiff's broker, Richard Sauerhaft, from submitting a bid on her behalf on the false pretense that Haynes had an exclusive on the commission (which she did not, given that she later split the commission with Minkin's broker).

Based on these material facts and unrefuted allegations, a reasonable jury or factfinder could conclude that Haynes' interference with Plaintiff's efforts to bid on the Apartment could have been based, in whole or in part, on Haynes' animus for Plaintiff's sexual orientation. See Jackson Decl. at ¶¶6-46

i.      *Plaintiff is a member of a protected class.*

Here, the plaintiff is a lesbian and Haynes had knowledge of Plaintiff's sexual orientation at the time of the pertinent facts, which undisputed by the parties. See Exh 26, Haynes Dep. Tr., 90:4-15. There may be an issue of fact as to when Haynes first learned of plaintiff's sexual orientation as the Complaint alleges that Haynes only found out when she first met Teka, Plaintiff's domestic partner, at the Apartment on or about March 25, 2017 (ee Defendants' Exh. Q, the Complaint at ¶_14).  On the other hand, Haynes attested that she knew that Plaintiff was gay well before March 25, 2017. See Exh 26, Haynes Dep. Tr., 90:4-15.  Be that as it may, Haynes' undisputed awareness of Plaintiff's sexual orientation is sufficient to satisfy the first part of the prima facie case.

Although sexual orientation is not explicitly identified as a class protected under federal Civil Rights statutes, the Second Circuit has held that  it falls under sex discrimination.  *See Zarda v. Altitude Express, Inc.,* 883 F.3d 100, 112 (2d Cir. 2018) (holding that sexual orientation discrimination claim against defendant employer was an actionable subset of sex discrimination under Title VII). Protected classes amongst the various federal anti-discrimination statutes are uniform.  Furthermore, if at any point during this action, it is determined by the US Supreme Court that sexual orientation is not a protected class under the pertinent federal laws, it is respectfully submitted that this Court exercise supplemental jurisdiction over the New York State and New York City anti-discrimination laws as stated in the Complaint. It is statutorily well settled that sexual orientation is a protected class under New York Executive Law 296[5] (the second cause of action) and under the New York City Human Rights Law (the third cause of action).

**ii.**    ***Plaintiff sought, and was qualified to purchase, the condominium unit in question***.

Plaintiff, immediately upon learning that Champel desired to sell the Apartment, sought to submit an offer commensurate with the market and informed by her due diligence.  From the end of March through early May 2017, plaintiff made (or attempted to make) approximately eight *bona fide* offers to purchase the Apartment.

Courts have found a plaintiff to be "qualified" for housing under the Fair Housing Act if he or she is financially able to rent or buy such housing. *Broome v. Biondi*, 17 F. Supp. 2d 211, 217 (S.D.N.Y. 1997); *Passanante v R.Y. Mgt. Co.*, 2001 US Dist LEXIS 1205, at *1 (SDNY Feb. 9, 2001); *see, e.g. Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979) (affirming the district court's finding that plaintiff was qualified because "he could afford to purchase the space sought").

Plaintiff was more than financially qualified to buy, much less bid for, the Apartment. Plaintiff was (and still is) an attorney with a stable income, stellar credit, and a history as a tenant in good standing in the very apartment she was seeking to purchase. Plaintiff obtained mortgage preapprovals through two separate banks for purchase amounts of up to $550,000.  See Exh. 25. Plaintiff even obtained underwriting approval for her purchase of the Apartment before a contract of sale was signed.  *See* Citibank conditional commitment letter, Exhibit **25**.  Typically, a bank will not issue a formal loan commitment until there is a signed contract of sale between the seller and buyer.  See Declaration of Antwan Johnson dated March 13, 2020 ("Johnson Declaration"), ¶ 5; see also Declaration of Richard Sauerhaft dated March 12, 2020 ("Sauerhaft Declaration"), ¶ 19.  Further, according to Antwan Johnson, plaintiff's mortgage broker at Citibank, plaintiff was financially qualified to purchase the Apartment in amounts at least up to $485,000 (see Johnson Declaration, ¶¶ 12-13; see also Sauerhaft Declaration, ¶ 13-14, 16.  Even though plaintiff's highest official bid was for $470,000, she was prepared to bid as much as the listing price ($499,000) (see

Declaration of Geannetta Jackson, ¶ 48), and was financially qualified to do so. Plaintiff would have bid higher but-for Haynes' constant interference, which effectively frustrated plaintiff's ability to competitively increase her bids for the Apartment as she was constantly sidelined by Haynes' improper demands, such as her insistence that plaintiff's lender unconditionally guarantee approval of the Condominium, and Haynes' misrepresentation that Champel was seeking only all-cash buyers.

Defendants themselves had every reason to believe that Plaintiff was qualified to purchase the Apartment.  Haynes herself personally vetted Plaintiff as a rental candidate in 2012 when plaintiff applied for the Apartment, and after reviewing plaintiff's financial documentation and credit history, deemed her a qualified rental applicant – so much so that plaintiff was accepted as a tenant by Champel.   Plaintiff was a model tenant for all the years she rented the Apartment and always paid her rent on time, in amounts up to $1,776.00 per month. Further, Haynes herself acknowledged, when plaintiff first expressed interest in purchasing the Apartment, that plaintiff's credit/FICO scores were "amazing" and that "any bank should be jumping [through] hoops for you" (see email from Haynes dated 4/24/17, annexed as **Exhibit 31**).

Defendants assert that because she required financing, she was not qualified to purchase the Apartment; nor was she qualified to match the higher all-cash offer precisely because she required financing.  Defendants go on to say that even if she had applied for financing in a higher amount, one can only speculate whether she would have been able to obtain it (see Defendants' memorandum of law in support of their motion for summary judgment, at p. 6).

Not only is this logic circular and self-serving, but it misses the point. First, there is probative evidence that Plaintiff could have competed with Minkin's "successful" bid.  AJ Johnson, her mortgage broker, attests that she could have received more financing if needed. See

Johnson Declaration at ¶12-13. Her Wells Fargo pre-approval letters evidence that she was eligible for financing up to $495,000 on a purchase price of $550,000.  Second, Haynes prevented Plaintiff, in the first instance, from participating in the bidding process, and could only show her ability to actually obtain financing after entering into a signed contract of sale with the seller.  This is what Plaintiff had been trying to achieve form the outset but was thwarted by Haynes every step of the way.

It is simply disingenuous for Defendants to argue the Plaintiff's ability to outbid or compete with Minkin for the Apartment is impermissibly speculative, when Haynes was responsible for keeping Plaintiff out of the bidding process and not accepting Plaintiff's efforts to outbid Minkin. Indeed, even after Haynes repeatedly frustrated Plaintiff's participation in the final bidding, Plaintiff still contacted Champel directly and asked him on May 9, 2017, "What price can I pay you so that I am able to purchase this condo from you?"  *See* Exhibit "16".

Here, there is sufficient evidence to prima facie demonstrate that Plaintiff was qualified to purchase the Apartment, that she wished to outbid all other prospective purchasers (namely Minkin), and had Haynes not repeatedly interfered and refused to accept Plaintiff's bids, she may have been the successful bidder.[5]

### iii.      *Plaintiff was rejected.*

This element of the *prima facie* test is undisputed, as Plaintiff's *bona fide* bids (or attempted bids) were rejected by the seller, as Haynes repeatedly denied her the opportunity to participate in the bidding process.  As a result, the Apartment was sold to another party, Barry Minkin and

---

[5] Pursuant to Plaintiff's cross-motion to preclude evidence, the Court should not consider any of the other bidders contained in the Bid Sheet (Defendants' Exhibit "**H**") in determining whether Plaintiff was outbid because Defendant never turned over the underlying documents and communications used to formulate the  Bid Sheet.

Christine Verrastro, and plaintiff lost out on the opportunity to purchase the Apartment and keep her home.

Furthermore, each act of interference by Haynes in response to Plaintiff's bids (or attempted bids) made by plaintiff amounted to a separate rejection or denial of Plaintiff's efforts to procure the purchase of the housing accommodation.

### iv.   The Apartment remained available following Plaintiff's rejection.

Defendants assert that plaintiff cannot prove the fourth element of her *prima facie* case, that the housing opportunity remained available to others following plaintiff's rejection, as "the apartment was sold to the highest bidder" (Defendants' memorandum of law in support). However, Plaintiff has established this element as it is clear from the facts that each time Haynes either failed to respond to one of Plaintiff's *bona fide* offers, interfered with her ability to negotiate or fully participate in the bidding process, or refused to submit her bid to the seller prior until Plaintiff complied with some arbitrary, unnecessary requirement (such as insisting she fill out a REBNY form even though she had already obtained a commitment letter), the Apartment remained open to other prospective purchasers who were not subject to such requirements (see discussion in section B, *infra*). In fact, Haynes had regularly been hosting open houses throughout this time period.  Haynes falsely claimed that she needed to conduct an open house for all-cash buyers and that Champel was seeking an all-cash buyer (even though the listing copy permitted financing in amounts up to 90%).  However, Haynes herself admits that out of five bids she says she received for the Apartment, four of these (including plaintiff's) were financed (see Haynes Decl., ⸗ 13).

Further, it is undisputed that following plaintiff's rejection, the Apartment remained available to Barry Minkin and Christine Verrastro, who ended up purchasing the Apartment pursuant to a contract of sale. See *Mitchell v. Shane*, 350 F. 3d 39, where the court found that after

the plaintiff's offer was rejected, the property remained available to at least one other prospective purchaser, a white purchaser, which the Here, like the plaintiffs in court said "speaks to the very essence of the fourth element". *Id*. at 48.

Here, the gravamen of the plaintiff's action is that she was treated differently from non-homosexual prospective buyers in the course of negotiations and, as a result, Minkin and Verrastro were able to purchase the property and plaintiff was not. *Id*. Thus, plaintiff has clearly established her prima facie case of housing discrimination.

**B.**    **Defendants have failed to demonstrate a legitimate, nondiscriminatory rationale for their decision to deny Plaintiff her housing opportunity and/or said rationale was pretextual.**

As plaintiff has established her *prima facie* case of housing discrimination (*see Broome v. Biondi, supra*), the burden now shifts to the Defendants to demonstrate a legitimate, nondiscriminatory reason for their actions. Defendants' main argument against plaintiff's claims is that she was outbid by an all-cash buyer, and that, secondarily, Plaintiff was not qualified to purchase the Apartment in any event.

As discussed in Point I, subpoint (ii) *supra*, plaintiff has clearly established that she was financially qualified to purchase the apartment, notwithstanding Haynes' attempts to undermine her qualifications. As for defendants' assertion that plaintiff was merely outbid, a closer look at the conduct of Haynes reveals a pattern of behavior - targeted to plaintiff and plaintiff only - that have no legitimate bases and are contradicted.

Although the exact timing is in dispute, plaintiff began experiencing issues with Haynes after Haynes' March 25, 2017 visit to plaintiff's Apartment, which plaintiff shared with her female fiancée (see Complaint, Exh. Q, ¶ 15). Shortly after this visit, Haynes stopped responding or became slow in her responses to plaintiff's inquiries about the status of her offers to purchase the

Apartment. It is unclear whether Haynes actually submitted plaintiff's bids to Champel in the first instance.

Over the course of approximately two months, beginning at the end of March 2017 and into the first part of May 2017, Plaintiff attempted to make approximately eight offers to purchase the Apartment.  Initially these offers were made through Haynes, but, when it became clear to Plaintiff that Haynes was not taking her bids seriously, Plaintiff conveyed her offers to Champel directly, who was a French citizen residing in France.[6]

On or about April 17, 2017 plaintiff increased her offer to $425,000 (see Jackson Declaration, ¶22), which was the amount of a counteroffer previously made by Champel.  In response, Haynes insisted on conducting open house showings for the Apartment, which she told plaintiff were for all-cash buyers only, due to the risk and uncertainty posed by financed offers. The Apartment listing, however, stated that 90% financing was available (see Defendants' Exhibit E).  When questioned, Haynes maintained that there is no requirement that the listing indicate the Apartment is being sold for all-cash only.  Haynes herself admits, in her Declaration in support of her motion for summary judgment, that four out of five offers made on the Apartment required financing (see Haynes Declaration, ¶ 13).

Haynes had also falsely informed plaintiff that Champel could not respond to her offers without reviewing the Condominium's financials and determining whether or not the Condominium was eligible for purchaser financing (see Jackson Declaration, ¶20), even though previous purchasers of non-sponsor units in the building – successfully obtained bank financing through the same banks (Wells Fargo and Citibank) from which plaintiff had obtained

---

[6] Champel's ability to write in English was somewhat limited, and Haynes admitted that communications about the Apartment went primarily through her as his real estate agent.  See Haynes Dep. Tr., 192:15-21, Exhibit S.

preapprovals, and even though plaintiff's mortgage brokers confirmed that the Condominium would be approved for financing.

Haynes even went so far as to contact plaintiff's mortgage broker[7] from Citibank, AJ Johnson, and ask him detailed questions about plaintiff's finances, including the maximum loan amount she would be able to obtain (see Jackson Declaration, ₱ 27). Haynes herself admitted that "[t]he intent of the call [with Mr. Johnson] was to see if she could offer more than what she was. Because…the present offer was much lower than what Dr. Champel was looking for. And I tried to repeatedly encourage her to increase her offer." Haynes Dep Tr. 160:13-18, Exhibit 26. Had Haynes truly encouraged plaintiff to increase her offers, she should would have provided plaintiff with a $485,000 counteroffer as she said she would do in her May 2, 2017 email to Champel (see Exhibit 22).

Attempting to assuage any lingering concerns about her ability to finance the purchase of the Apartment, plaintiff went so far as to obtain a conditional loan commitment from Citibank in connection with her increased offer for $444,000 (see Exhibits 11, 25). However, this was not enough for Haynes, who subsequently insisted that plaintiff complete a detailed financial form prepared by the Real Estate Board of Examiners of New York (REBNY) that Haynes claimed "always accompanies an offer that is presented to an owner" and which is the "last piece of information needed before Frederic [Champel] responds to your offer." See email dated 4/26/17, Exhibit 13. Later, Haynes would falsely claim that the Condominium required the form for every prospective purchaser (see Exh. Q, Complaint, ¶ 35). The Condominium, in fact, has no such requirement and does not even look into the financials of a prospective purchaser until after a

---

[7] Haynes did not ask plaintiff for permission to speak with her mortgage broker. Rather, Haynes summarily informed plaintiff in an email dated 4/20/17 that she would speak with her mortgage broker "to ask him if he could guarantee that if your offer of $444k is accepted that his bank could definitely do the loan." See Exhibit 8.

waiver of the right of first refusal application has been submitted to the board of managers, along with a contract of sale between the buyer and seller. In fact, the Condominium has no right to reject a unit purchaser. Pursuant to Article VII, Section 1(a) of its  By-Laws, (starting on p. 25 of Ex. 32), the board of managers instead must, within 30 days of the purchaser's request for the waiver, exercise its right of first refusal and purchase the unit at the contract price of the buyer, otherwise the board's right is deemed waived by the terms of the By-Laws and the buyer's contract of sale can proceed to closing. *See* Exhibit 32, which is a true and correct copy of the Harlem Sol Condominium's By-Laws[8] at Article 7 which requires the Board of Manager to issue the waiver of the right of first refusal; *see also* Sauerhaft Declaration, ⁋ 11.

At one point, plaintiff, dismayed by Haynes' actions and desperate to have her bids taken seriously (and upon the recommendations of AJ Johnson following his interactions with Haynes)[9], retained her own buyer's agent in an attempt to negotiate for the Apartment.  After plaintiff's agent, Richard Sauerhaft, submitted a bid for $444,000, Haynes falsely told Sauerhaft that he had no standing to submit an offer on plaintiff's behalf because, according to Haynes, plaintiff's Halstead rental agreement contained a provision that Haynes would be her exclusive agent in the event she desired to purchase the property. *See* Sauerhaft Decl. ⁋ 8.  There was no such provision in Plaintiff's lease, or renewal leases.

By early May 2017, Plaintiff, feeling defeated and dismayed, had no faith or belief that she would be treated fairly given Haynes previous behavior.  Therefore, when Haynes asked to hold a final open house for submission of "best and final bids", out of desperation she contacted Champel

---

[8] Like all condominiums in New York State, Harlem Sol Condominium's By-Laws are part of its recorded declaration a publicly available document retrieved from the ACRIS system. The recording of the declaration is a requirement of condominium creation under the Condominium Act [NY RPL §§ 339-d through- 339-kk].

[9] See Jackson Declaration, ⁋ 30.

directly and asked him, "What price can I pay to you purchase the Unit?" (see email dated May 9, 2017, Exhibit 16).  Having no way of knowing the amounts of competing bids (if any actually existed), Plaintiff attempted to submit one more offer in the amount of $470,000.  Even though Haynes had a duty to convey any and all offers to the seller regardless of when received, even after a "best and final" deadline (see Sauerhaft Decl. ¶ 17), Haynes failed to do so (see Exh. 26, Haynes Dep. Tr., 198:8-9, 14-15, where Haynes admits that, although she received Plaintiff's $470,000 offer, it came in after the "best and final" deadline set by Haynes and therefore was not considered).  Haynes further admitted during her deposition that while Plaintiff attempted to put herself back into the bidding process with her $470,000 counteroffer, "unfortunately, it was after the deadline of her highest and best. And Dr. Champel had already chosen, selected an offer to proceed with." Haynes Dep. Tr., 163:5-8, Exhibit 26).

Plaintiff was never given an opportunity to fully participate in the bidding process, due to Haynes' actions, which departed way beyond what is customary of licensed real estate brokers, regardless of whether they represent buyers or sellers. Plaintiff further contends that no other prospective purchaser was subjected to the same requirements as to which she was subjected, particularly with respect to proof of her financial qualifications.  Defendants have asserted that Haynes asked for the same financial information from each prospective purchaser prior to submitting their bids to Champel for consideration (see Exhibit 26).  However, Defendants have failed to produce a scintilla of proof in support of this assertion, despite Plaintiff's repeated requests for the same and despite the Court's order of January 10, 2020 (see Point II, *infra*). Defendants have refused to produce any documents (including written offers, email communications or otherwise) between Haynes and the other prospective purchasers who submitted bids on the Apartment, despite Haynes' (new) allegations that three other prospective

purchasers submitted bids which required financing (see Haynes Declaration at ℙ 13) and thus would presumably have been subject to the same extensive inquiries from Haynes if she is being truthful.  Instead, the only documentation produced by the defendants regarding the other bids was the Bid Sheet that defendants allege was prepared by Haynes based on verbal information (see Exhibit H), and which Defendants now to seek to categorize in their motion as "business records" (see Haynes Declaration; see also Defendants' memo of law in support). As discussed in Point II, *infra*, Plaintiff is entitled to, among other things, an adverse inference instruction that no other bidders were asked to complete financial forms before consideration of their bids, an adverse inference that Haynes did not solicit or receive any bids higher than $485,000 (the price the Apartment was actually sold for), and an order precluding Defendants from introducing evidence of other bids.

Finally, evidence produced by the Defendants reveals that following an open house in or about early May 2017, Haynes told Champel that she expected to receive a written offer for $480,000 (presumably Minkin's all-cash offer), and that she would counter plaintiff's $444,000 offer with $485,000 "to see if she will come up to that number or something close to that number". See email from Haynes to Champel dated 5/2/17, Exhibit 22.  Haynes never countered plaintiff with $485,000 or any other amount.  Had Haynes countered plaintiff at $485,000, the price the Apartment ultimately sold for and for which plaintiff was qualified, plaintiff would have been the successful bidder.

A reasonable jury could conclude that rather than countering plaintiff with a $485,000 counteroffer, Haynes, using the promise of a $15,000 closing credit, reached a deal with Minkins without ever having to go back to Plaintiff to give her the opportunity to counterbid.  There is already an indication that Haynes intended to shut plaintiff out of the competitive bidding pool.

See email from Haynes to Champel dated April 3, 2017, Exhibit 33, wherein Haynes discredits plaintiff's financial qualifications Plaintiff on the backburner while entertaining offers from the general public.   It's not far-reaching to conclude that Haynes used plaintiff to generate a deceptively higher bid, and that her conduct was motivated by some discriminatory animus against Plaintiff.

Alternatively, a reasonable jury could conclude that following, Minkin's all-cash offer for $480,000, Haynes falsely informed him that another bidder (plaintiff) counterbid for $485,000, or even higher, leading to Minkin's subsequent winning offer of $499,000 (which was subsequently reduced to $485,000 after the purchasers learned about Haynes' deception regarding the term of plaintiff's lease).

The totality of Haynes conduct raises far too many red flags to reach the conclusion that plaintiff's bids were rejected solely due to monetary considerations.  A seller's real estate agent has a duty to the seller to enable bids, not to suffocate them. Plaintiff had demonstrated a willingness to increase her bids; there was no legitimate reason for Haynes to consistently thwart these bids along the way.  A reasonable jury could conclude that Plaintiff's sexual orientation was at least one factor in Haynes' decision to refuse to negotiate with her.

## POINT II

### PLAINTIFF'S CROSS-MOTION TO PRECLUDE AND FOR SANCTIONS UNDER FRCP 37 SHOULD BE GRANTED DUE TO DEFENDANTS' FAILURE TO TURN OVER RESPONSVE DOCUMENTS IN DISCOVERY

Under FRCP 37(c), if a party fails to provide information as required by FRCP 26(a) (requiring a party to provide to the other party a copy or description of all documents in the disclosing party's possession used to support its claims or defenses), the party is not allowed to use that information to supply evidence on any motion, at a hearing, or at a trial, in addition to any other sanctions imposed by the Court.  FRCP 37(c)(1).

FRCP 37(b)(2) authorizes a court to impose sanctions when a party "fails to obey an order to provide or permit discovery." *See* Fed. R. Civ. P. 37(b)(2); *see also Transatlantic Bulk Shipping Ltd. v. Saudi Chartering S.A.*, 112 F.R.D. 185, 189 (S.D.N.Y. 1986) (holding that Rule 37(b) "provides for sanctions where a party fails to honor its disclosure obligations, especially after court orders"). Sanctions may be imposed upon a party or counsel who deliberately fails to make a disclosure required by Rule 26(a), Fed. R. Civ. P. 37(b)(2)(A), or who provides an evasive or incomplete disclosure, answer or response. Fed. R. Civ. P. 37(a)(3); *See Nike. Inc. v. Top Brand Co. Ltd.*, 216 F.R.D. 259, 267 (S.D.N.Y. 2003). Sanctions are particularly appropriate when the party against whom sanctions are sought has failed to comply with a court order to provide discovery. *See, e.g., United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir. 1995); *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers and Cement Masons Int'l Ass'n*, 889 F.2d 389, 394 (2d Cir. 1989). However, "even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106 (2d Cir. 2002). Where the alleged breach of a discovery obligation involves the non-production of evidence, the Second Circuit has held that the district courts have broad discretion in fashioning an appropriate sanction. *Id.* at 107.

A variety of sanctions are available under Rule 37(b)(2) for a party's failure to obey a discovery order. FRCP 37(b)(2) provides, in relevant part, that if a party fails to obey a discovery order, the court "may make such orders in regard to the failure as are just," including, but not limited to, orders "directing that . . . designated facts be taken as established for purposes of the action, as prevailing party claims" and "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed.

R. Civ. P. 37(b)(2)(A). Rule 37(b) also provides that, in lieu of or in addition to any other appropriate order:

> the court *shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The determination of an appropriate sanction "is confined to the sound discretion of the trial [court] and is assessed on a case-by-case basis." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("*Zubulake V*") (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). A court considers several factors when deciding whether to exercise its broad discretion to order sanctions, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance[;] and (4) whether the non-compliant party had been warned of the consequences of [his] non-compliance." *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)). *Hawley, Id.* (*Hawley v Mphasis Corp.*, 302 FRD 37, 46 [SDNY 2014]).

## I.     Defendants' Failures to Produce Financial Forms and Underlying Bid Information Identified during Haynes' Deposition Testimony and in Defendants' Discovery Responses Require an Adverse Inference

Although adverse inference instructions "usually [are] employed in cases involving spoliation of evidence," a court also may grant an adverse inference instruction for the non-production of evidence. *Hawley v Mphasis Corp.*, 302 FRD 37, 54 (SDNY 2014). The availability of such sanctions for non-production of evidence stems from the district court's broad discretionary power in sanctioning a party for discovery abuses.  *See Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).

A party requesting an adverse inference "must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact would find that it would support that claim or defense."  To satisfy this test, the party seeking the adverse inference must show both that its opponent defied a court order or an obligation under the Federal Rules of Civil Procedure, and that the evidence it has requested in fact exists.  *Odyssey Mar. Exploration, Inc. v Shipwrecked & Abandoned SS Mantola*, 2019 US Dist LEXIS 200891, at *8 (SDNY Nov. 19, 2019) (internal citations omitted).

Plaintiff has established each of these factors with respect to defendants' failure to provide (a) the financial forms, specifically the REBNY forms, that defendant Haynes testified she obtained from each potential bidder for the Apartment (see Haynes Dep. Tr., 134:15-22, 120:25; 121:2-14, Exhibit 26), and (b) the underlying documents (including email communications) relating to each of the bids (other than plaintiff's bids) that defendant Haynes allegedly received for the Apartment from prospective purchasers.

Here, defendants plainly had an obligation to produce the requested materials under their control. "[T]he obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Under FRCP 26(a)(1)(A)(ii) defendants had a duty to provide plaintiff with copies of all documents, electronically stored information and other tangible things in defendants' custody and control that defendants may seek to use to support their claims and defenses.  In this case, defendants have denied that plaintiff was treated differently from other bidders for the Apartment

in that she was asked to complete and submit detailed financial forms as a condition to Haynes' submission of her bid to the seller while other bidders were not asked to do so (see Haynes Dep. Tr., 134:15-22, 120:25; 121:2-14, Exhibit 26).   Further, defendants' interrogatory responses specifically identified certain pertaining to bids received for the Apartment from certain prospective buyers (see Exh. 27, Defendants' Responses to Plaintiff's Interrogatory No. 5). Defendant Haynes herself stated during her deposition that she asked for, and obtained, financial forms from each individual who submitted a bid for the Apartment (see Haynes Dep. Tr., 134:15-22, 120:25; 121:2-14, Exhibit 26).   Plaintiff has made various, specific requests for this information (see Exh. 28, Plaintiff's First Request for Production of Documents, Demand Nos. 13, 15, 16, 27; emails to defendants' counsel, Exh. 30), all of which defendants have either ignored or for which they provided evasive and contradictory responses (for example, defendants' formal responses to plaintiff's document demands indicated that documents would be available for inspection; when responsive docs were finally provided, they were incomplete in that email communications were absent; when emails were provided (months later) they lacked any communications between Haynes and prospective buyers despite the fact plaintiff had been requesting these from the early stages of the case and despite identification of certain records in defendants' interrogatory responses).   The Court itself, at a status conference held on January 10, 2020, directed the defendants to produce the outstanding materials and underlying documents for spreadsheet by January 24, 2020, which date has come and gone without the required production. See Brandt Declaration, ¶14.  For these reasons, defendants clearly had an obligation to produce the materials requested.  *See Doug's Word Clocks.Com Pty. Ltd. v Princess Intl., Inc.*, 323 FRD 167 (SDNY 2017) (district court held that certain defendants clearly had an obligation to produce sales records in intellectual property infringement case where plaintiff had made multiple request

for documents, where court had ordered the production of such records, where defendant failed to produce complete versions of certain emails, and where such information was highly relevant to the case).

With regard to the second factor, defendants' repeated failures to turn over relevant documents or provide a credible story regarding their whereabouts, despite the Court's admonition and repeated requests from the plaintiff, and despite defendants' prior contradictory statements about their existence, establishes a culpable state of mind.  See *Doug's Word Clocks, Id.,* at 174; *see also PSG Poker, L.L.C. v. DeRosa-Grund*, No. 06 CIV. 1104 (DLC), 2008 U.S. Dist. LEXIS 4225, 2008 WL 190055, at *12 (S.D.N.Y. Jan. 22, 2008).  See also *PSG Poker, LLC v. DeRosa-Grund*, No. 06-cv-1104 (DLC), 2008 U.S. Dist. LEXIS 4225, 2008 WL 190055, at* 12 (S.D.N.Y. Jan. 22, 2008) ("failure to either produce relevant documents or a credible story regarding their whereabouts—despite the admonitions of this Court and repeated requests from the plaintiffs— can only be interpreted as an intentional and willful act").  Defendants have made material misrepresentations about the existence of the financial forms and related email communications with prospective buyers for the Apartment in question.  Defendants initially identified certain communications between Haynes and prospective buyers in their interrogatory responses (see Exhibit 27), and Haynes later testified that she herself requested, and obtained, a completed REBNY form from each bidder (see Haynes Dep. Tr., 134:15-22, 120:25; 121:2-14, Exhibit 26). Defendants ultimately produced a two-page "spreadsheet" listing various bids allegedly made for the Apartment by prospective purchasers (see Exhibit **H).**  When pressed for the underlying email communications and other documentation used to create such spreadsheet, defendants suddenly changed their position, alleging that the spreadsheet was created from "verbal information" and that consequently there was no underlying documentation (see Exh. 30).  It strains credulity to

believe that defendants are not in possession of one single email communication, text message, written offer or other document relating to or referencing any of the bids for the Apartment referenced on the spreadsheet, particularly when defendants identified records in their interrogatory responses and defendant Haynes herself admitted she asked for, and obtained, such documents. Such actions on demonstrate a willful intent on the part of defendants in shirking their discovery obligations.   At a minimum, defendants were plainly negligent in failing to produce responsive documents in a timely, thorough, and proper manner (see *Doug's Word Clocks, Id.*, at 173, citing *Short v. Manhattan Apartments, Inc.*, 286 F.R.D. 248, 254; *see also R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 23 (S.D.N.Y. 2010) ("In the Second Circuit, negligence is sufficient to establish culpability." (citing *Residential Funding*, 306 F.3d at 108).

Finally, to establish entitlement to an adverse inference, a party must establish that the unavailable evidence is "relevant" to its claims or defenses. Specifically, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed evidence would have been of the nature alleged by the party affected by its destruction. *See Residential Funding*, 306 F.3d at 109. Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or failed to produce evidence," because doing so "would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." *Id.* However, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence in bad faith or through gross negligence, that same evidence of the opponent's state of mind will frequently be sufficient to permit a jury to conclude that the missing evidence is favorable to the prejudiced party. *Id.*

Here, the missing evidence – the financial forms that Haynes asked to be completed by each prospective purchaser, and the underlying email and other communications between defendants and each of the bidders - is relevant to the central claims at issue, *i.e.*, that Plaintiff was subjected to higher and more burdensome standards than other prospective purchasers of the Apartment, which goes to the "disparate treatment" prong of plaintiff's discrimination claims.

For the reasons above, and in accordance with the Court's broad discretionary authority to craft appropriate sanctions, Plaintiff has clearly established her entitlement to an adverse inference instruction deeming the following facts to be established:   (1) that Haynes treated Plaintiff differently than other prospective purchasers of the Apartment by demanding that she complete and submit detailed financial forms before her bid could be submitted to the seller; (2) that Haynes did not ask any other prospective purchaser to complete REBNY forms, any other financial forms, or disclose any financial details prior to submitting their bids to the seller; (3) that Haynes did not solicit or receive any bids higher than $485,000 (the price the Apartment was actually sold for).

## II.     Defendants Should be Precluded from Introducing the Bid Sheet as Evidence Rebutting Plaintiff's Claim that She was Treated Differently than Others Similarly Situated.

The Court can preclude the testimony of a witness on the basis of numerous factors including: (1) willfulness of the non-compliant party, (2) the history of noncompliance, (3) the efficacy of lesser sanctions, and (4) whether the party is aware of the consequences of non-compliance. *See Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002); *3801 Beach Channel, Inc. v. Shvartzman*, No. 05-CV-207 (CBA) (JO), 2007 U.S. Dist. LEXIS 72788, 2007 WL 2891119, at *4 (E.D.N.Y. Sept. 28, 2007); *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 853 (2d Cir. 1995)).   The Court must also consider the extent to which the prevailing party has been prejudiced by the defaulting party's noncompliance, *See Doug's Word Clocks.Com*, 323

FRD 167, 174, citing *Anthropologie, Inc. v. Forever 21, Inc.*, No. 07 Civ. 7873 (RJS) (MHD), 2009 U.S. Dist. LEXIS 20908, 2009 WL 690126, (S.D.N.Y. Mar. 13, 2009). "No particular factor is dispositive, and sanctions must be weighed in light of the full record of the case." *See Cine-Forty Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979).

Here, Defendants have demonstrated a blatant and willful disregard for the discovery process and have thwarted Plaintiff's attempts to procure discovery that is central to this case, by engaging in dilatory tactics designed to thwart the discovery process presumably because the information sought is central to Plaintiff's claims. Plaintiff has been prejudiced by defendants' noncompliance in that, among other things, plaintiff did not even have the "Bid Sheet" at the time of defendant Haynes' deposition and the delays and noncompliance has hindered Plaintiff's discovery and the prosecution of her claims.  Further, Defendants are fully aware of the consequences of noncompliance as they have been warned by the Court, at the January 10, 2020 status conference, about the deadline for production of the outstanding documents and by correspondence from plaintiff's counsel that it would seek sanctions for defendants' failures to comply with outstanding discovery. *See* Brandt Declaration at ¶¶ 13-15; *see also* email to Andrew Saulitis dated November 22, 2019, Exh. 30.

For the reasons set forth herein, defendants should be precluded from introducing the testimony of Ayo Haynes or introducing any other evidence that prospective purchasers were asked to complete financial forms prior to having their bids submitted to the seller, or any way rebutting plaintiff's allegation that she was treated differently and subjected to more burdensome standards than other bidders in her attempts to purchase the apartment in question.

III.     **Defendants' Answer Should be Stricken for their Failure to Produce Financial Forms and Underlying Bid Information Identified during Haynes' Deposition Testimony.**

Rule 37 of the Federal Rules of Civil Procedure provides in pertinent part:

> If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: . . . (C) An order striking out pleadings or parts thereof, . . . or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

In determining what sanctions to impose, the Court must consider (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance. *See Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (internal quotation marks omitted). The Court must also consider the extent to which the prevailing party has been prejudiced by the defaulting party's noncompliance. *See Anthropologie, Inc. v. Forever 21, Inc.*, No. 07 Civ. 7873 (RJS) (MHD), 2009 U.S. Dist. LEXIS 20908, 2009 WL 690126, at *3 (S.D.N.Y. Mar. 13, 2009), and must ensure that any sanction imposed is "just and commensurate with the failure to comply," *Biosafe-One,* Inc. v. Hawks, 639 F. Supp. 2d 358, 370 (S.D.N.Y. 2009). Extreme sanctions, such as striking a pleading or entering judgment against the offending party, are "pungent, rarely used, and conclusive. A district judge should employ [them] only when he is sure of the impotence of lesser sanctions." *Ocello v. White Marine, Inc.*, 347 F. App'x 639, 641 (2d Cir. 2009) (internal quotation marks omitted). Although the striking of an answer is an "extreme measure," discovery orders are meant to be obeyed. *Bambu Sales v. Ozak Trading*, 58 F.3d 849, 853 (2d Cir. N.Y. 1995). "A party who flouts such orders does so at his peril." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988). Rule 37 provides the Court with strong medicine for treating such behavior. *Id*.

Defendant's answer should be stricken, and default judgment should be entered in favor of plaintiff because defendants have willfully shirked their discovery obligations, violated court order, made misrepresentations to the court, and refused to provide documents that defendants themselves deem to exist.  Defendants' noncompliance continues to this day; they have made clear they do not intend on producing the documents in question. Striking Defendants' answer is therefore warranted because no lessor sanction would be effective.  Alternatively, the Court should strike Defendants' answer to the extent it denies the allegations set forth in Plaintiff's complaint that (a) she was treated disparately from other non-homosexual bidders for the apartment and (b) asserting that Plaintiff's denial of the apartment was based solely on financial considerations.

## IV.   Plaintiff is Entitled to her Reasonable Attorney's Fees for Defendants' Failure to Comply with Discovery.

FRCP Rule 37(b) provides that, in lieu of or in addition to any other appropriate order,

> the court *shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Here, there is no justification for Defendants' failures to comply with the outstanding discovery or other circumstances that would make an award of expenses unjust.  Therefore, plaintiff is entitled to an order directing defendants to pay plaintiff's costs and reasonable attorneys' fees incurred for bringing this motion in an amount to be determined at a fee hearing.

**CONCLUSION**

For the reasons set forth herein, Defendants' motion for summary judgment to dismiss Plaintiff's Complaint should be denied, and Plaintiff's FRCP 37 cross-motion should be granted to preclude Defendants' evidence for their failure to comply with discovery and for sanctions.

Dated: March 17, 2020
       New York, NY

Respectfully submitted,

**WAGNER, BERKOW & BRANDT, LLP**

_____/s/_____
Ian J. Brandt, Esq.
Attorneys for Plaintiff Geannetta Jackson
462 7th Avenue, 6th Floor
New York, NY 10018
(646) 791-2086