UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

JANE DOE,

                        Plaintiff,


        -against-         Case No. 1:18-cv-05436


HALSTEAD PROPERTY, LLC, HALSTEAD MANHATTAN, LLC
and AYO HAYNES,

                        Defendants.

----------------------------------------X

                        December 23, 2019

                        TIME 10:42 a.m.


   EXAMINATION BEFORE TRIAL of Ayo Haynes, a

Defendant herein, taken by the respective

parties, pursuant to Order, held at the offices

of Wagner Berkow, LLP, 1410 Broadway, 23rd

Floor, New York, New York, before Shechinah

Jackson, a Notary Public for and within the

State of New York.

                LH REPORTING SERVICES, INC.
                Computer-Aided Transcription
                    88-36 Sutphin Blvd.
                    Jamaica, NY 11435

1

2            A P P E A R A N C E S:

3    LAW OFFICES OF ANDREW P. SAULITIS P.C.
        Attorneys for Defendants
4        40 Wall Street, 37th Floor
        New York, New York 10005
5    BY:    ANDREW P. SAULITIS, ESQ.
        Email:  Apslaw@msn.com

6

7    WAGNER BERKOW, LLP
        Attorneys for Plaintiff
8        1410 Broadway, 23rd Floor
        New York, New York 10018
9    BY:    NIKI KHINDRI, ESQ.
        Email:  Nkhindri@wagnerberkow.com
10

11   BY:    IAN J. BRANDT, ESQ.
        Email:  Ljbrandt@wagnerberkow.com
12

13

     Also Present:  Jane Doe
14

15

16

17

18            *       *       *       *       *

19

20

21

22

23

24

25

1                    A. HAYNES

2        Q.  Were you aware prior to -- strike

3    that.

4            Were you aware that Ms. Doe was and

5    is a lesbian?

6        A.  Yes.

7        Q.  When did you first become aware of

8    this?

9        A.  I'm not sure of the year.  I'll say

10   not long.  I don't know the time reference,

11   but Jeff Lieberman and I -- I think I was

12   visiting Jeff Lieberman in his apartment and

13   he told me that she and Nina Binder, who was

14   the unit owner in eight, were in a

15   relationship or had been in a relationship.

16   So I would put that around late 2012.

17       Q.  Why were you discussing Ms. Doe's

18   relationship status with Mr. Lieberman?

19           MR. SAULITIS:  Objection to form.

20       A.  It wasn't something that I asked.  It

21   was something that came up in conversation

22   from Mr. Lieberman.

23       Q.  This was from 2012 you said to the

24   best of your recollection?

25       A.  Well she moved into the apartment in

```
1                      A. HAYNES
2              MR. SAULITIS:  Objection to form.
3         A.  You said, is it industry practice
4    that Halstead --
5         Q.  Does Halstead follow any industry
6    practice to financially vet buyers prior to
7    transmitting offers to sellers?
8              MR. SAULITIS:  Objection to form.
9         A.  Yes.
10        Q.  Ms. Haynes, do you know who Barry
11   Minkin is?  M-I-N-K-I-N.
12        A.  Yes.
13        Q.  Do you know who Christina Verrastro
14   is?
15        A.  Yes.
16        Q.  Who were are those individuals?
17        A.  They purchased the apartment from Dr.
18   Champel.
19        Q.  What was the -- strike that.
20             What offer did they, Mr. Minkin and
21   Ms. Verrastro initially make for the
22   apartment?
23        A.  We'd have to check the exact number;
24   but I'm pretty sure it was 480, all cash.
25        Q.  At the time that Mr. Minkin and Ms.
```

```
1                    A. HAYNES
2     Verrastro submitted their -- made their
3     initial offer, did you ask for any
4     documentation from either both of them about
5     their financial qualifications?
6          A.   Through their agent, yes.
7          Q.   What kind of information did you
8     request?
9          A.   The same that I requested of Ms. Doe
10    the revenue form from the Real Estate Board
11    of New York.  And because they were paying
12    all cash, I did request a letter from their
13    financial advisor attesting to the fact they
14    can pay all cash.
15         Q.   How did you make this request; if you
16    can recall?  Was it in an e-mail?
17         A.   To their agent.
18         Q.   Did you receive any responsive
19    documents to this request?
20         A.   Yes.
21              MS. KHINDRI:  At this point, I'd
22           like to make a call, request for those
23           -- that documentation as that was not
24           produced to us during discovery.
25           Despite having requested any and all
```

1       A. HAYNES

2       -- approve list and could a building with

3       those, the numbers that I just spoke of, be

4       approved?  And would a purchaser be able to

5       purchase or get a mortgage through Wells

6       Fargo.

7           Q.  What was Mr. Perodin's response to

8       those questions?

9           A.  He said that based on the number of

10      renter-occupied versus occupied, and the

11      financials, that it would be very difficult

12      for Wells Fargo to approve the building.  And

13      he suggested that we try to get an all cash

14      offer to try to work with that process.  And

15      that was communicated to Dr. Champel.  And I

16      also gave Ms. Doe his number so she could

17      confirm what I spoke of with him herself.

18          Q.  Are you aware of any other units in

19      the building whose purchase was funded in

20      whole or in part by any bank loan?

21          A.  After resale?

22          Q.  After resell, before resale.

23          A.  So as discussed before, when there

24      were some units that purchased via financing

25      directly from the sponsor, and when the

                    A. HAYNES

2   sponsor was selling the units.  Unit one, I

3   believe, was also financed through Wells.

4       Q.  Unit one was -- did get a finance --

5   financing from Wells?

6       A.  Yes.

7       Q.  So when was this?  Do you know when

8   this was?

9       A.  When they purchased the apartments.

10      Q.  And the purchaser didn't have any

11  difficulty getting financing at that time?

12          MR. SAULITIS:  Objection to form.

13      A.  I don't remember.  But that was also

14  probably at least a year or maybe a few

15  months, six months to a year in advance of

16  that -- circumstances.  Each purchase will

17  change the number of owners to renters.

18      Q.  So am I correct in saying that your

19  opinion about Ms. Doe's ability to obtain

20  financing from a bank, was guided primarily

21  by Mr. Perodin?

22      A.  Well, Mr. Perodin has several years

23  of experience in the industry, handling

24  mortgages solely in one of the largest

25  offices within our company.  He also -- I

```
1                        A. HAYNES
2      today, I spoke to one who is putting in an
3      offer of $480,000.  I'll let you know as soon
4      as I receive the offer in writing."
5              So my question is, did you receive a
6      written offer for $480,000?
7          A.  Yes.
8          Q.  When did you receive this offer?
9          A.  The next day.
10         Q.  Did you receive a written offer?
11         A.  I believe so, yes.
12         Q.  Who made the offer?
13         A.  I would have to check to see who this
14     offer is exactly from, but we had four offers
15     that end up materializing.
16             MS. KHINDRI:  At this time, for
17          the record, I'm going to make a
18          request for all written materials,
19          documents, communications regarding
20          any and all offers for the apartment,
21          including an offer for $480,000.  To
22          the extent that we have not already
23          received those documents in the course
24          of defendants' document production.
25             MR. SAULITIS:  Taken under
```

1                    A. HAYNES

2        Q.  Was that the offer of Mr. Minkin and

3    Ms. Verrastro?

4        A.  After -- yes.

5        Q.  Upon receiving each of these offers

6    from various buyers, did you request

7    documentation from each of those bidders

8    regarding financial status, revenue form, et

9    cetera, et cetera?

10           MR. SAULITIS:  Objection to form.

11        You have to fill in et cetera, et

12        cetera.  That's --

13           MS. KHINDRI:  I will strike the et

14        cetera, et cetera portion.

15        Q.  Did you ask -- for each of the offers

16    that you received following the open house,

17    did you ask that the buyers -- did you ask

18    the buyers to submit to you a completed

19    financial REBNY form?

20        A.  Yes.

21        Q.  Did they submit those forms?

22        A.  Yes.

23           MS. KHINDRI:  Again, I will

24        request the production of any and all

25        financial forms associated with

```
1                      A. HAYNES
2          A.   $499,000, all cash.
3          Q.   Was that -- was that subsequently
4     reduced?   That purchase price subsequently
5     reduced?
6          A.   Unfortunately, yes.
7          Q.   What was it reduced to?
8          A.   It was reduced to $485,000 because
9     the Minkins felt that Ms. Doe would be
10    difficult to work with later on.  She refused
11    to sign the estoppel agreement which gave her
12    lease over to the new purchasers.  They
13    feared that they would have to hire a lawyer.
14    So the price was reduced $15,000 or $14,000.
15         Q.   Wasn't it true that Ms. Doe had an
16    effective lease that was -- which had an end
17    date that was misrepresented on the listing?
18              MR. SAULITIS:  Objection to form.
19         A.   The effective date says there,
20    January 2018.
21         Q.   Isn't it true that the reason the
22    purchase price was reduced was due to a
23    mistake as to the termination date for Ms.
24    Doe's lease?
25              MR. SAULITIS:  Objection to form.
```

```
1                    A. HAYNES
2         A.  Is it -- sorry.
3              (The requested portion of the record
4           was read by the reporter.)
5         A.  No, I would not.
6         Q.  Did you ever inform Ms. Doe that she
7    could proceed with her offer if she were able
8    to obtain a guarantee that she'd be financed
9    in connection with the purchase of her unit
10   -- of unit four?
11        A.  Can you read it back.
12             (Whereupon, the last question was
13          read back.)
14        A.  Ms. Doe was never prohibited from
15   proceeding with her offer to offer her best
16   offer to obtain the apartment.  Like anyone
17   else who came to see the apartment, she was
18   always encouraged to put in her highest offer
19   within the confines of what was countered to
20   her.
21             MS. KHINDRI:  All right.  Let's
22          take a minute.
23             (A brief recess was taken.)
24             (Whereupon, a portion of the
25          record was read back.)
```

                        A. HAYNES
1

2   there a time when she ever came back and

3   indicated that she did indeed wish to try to

4   stay in the bidding process?

5       A.  Yes.  But unfortunately, it was after

6   the deadline of the highest and best.  And

7   Dr. Champel had already chosen, selected an

8   offer to proceed with.

9       Q.  After you had -- strike that.

10          Did you have an open house for the

11  apartment after -- at any time after Dr.

12  Champel had already accepted an offer?

13      A.  I had a showing for the person who

14  had won the offer.

15      Q.  Ms. Haynes, I just want to go back to

16  something that you testified previously

17  regarding the reason that a contract price

18  for the apartment by the Minkins was reduced.

19          I hope I can just restate this,

20  summarize it without having to go back and

21  read exactly your testimony.  But roughly, it

22  was because -- am I correct in saying that

23  according to your testimony, the reason the

24  purchase price was reduced was due to the

25  behavior, the conduct of Ms. Doe?

1           A. HAYNES

2    sold having to sign the estoppel certificate?

3           MR. SAULITIS:  Objection to form.

4           Ms. KHINDRI:  Strike that.  I can

5        rephrase.

6        Q.  Do you know of any requirement for

7    tenants in possession to sign an estoppel

8    certificate?

9        A.  I'm not a lawyer.  I wouldn't be able

10   to answer that.

11       Q.  Do you believe the reason for the

12   contract -- strike that.

13           Do you believe that the reason that

14   the purchase price of that contract was

15   reduced was because of Ms. Doe's alleged

16   failure to sign the estoppel certificate?

17           MR. SAULITIS:  Objection to form.

18       A.  It was one of the reasons.

19       Q.  What were the other reasons?

20       A.  She refused to give access for a

21   walk-through.

22       Q.  Anything else?

23       A.  It was not an easy process with her.

24   And the process was being delayed.  The

25   closing was being delayed.  There was

```
 1                    A. HAYNES
 2    obviously animosity on her part towards me
 3    being a part of the walk-through process or
 4    anything after that.  So we could not gain
 5    access.
 6          And as I said before, that was enough
 7    for them to feel there would be a problem
 8    going forth.
 9          Q.  Do you think that --
10             MR. SAULITIS:  Did you finish?
11          A.  And the fact, mainly she was not
12    returning phone calls of Dr. Champel nor the
13    agent for the new purchasers or returning
14    their e-mails.
15          Q.  Do you think that because there was
16    an error regarding the validity of Ms. Doe's
17    lease, which could have been a reason that
18    the purchase price was reduced?
19             MR. SAULITIS:  Objection to form.
20          Q.  Do you think that could have been a
21    reason?
22             MR. SAULITIS:  Objection to form.
23          A.  Do you have a need to request that
24    question?
25          Q.  I'll rephrase.
```

1          A. HAYNES

2          Do you think one of the reasons the

3    purchase price was reduced could have been

4    because of an error in the start and ending

5    dates of Ms. Doe's lease?

6             MR. SAULITIS:  Objection to form.

7       A.   I don't believe so.

8             MS. KHINDRI:  Mark this as 6.

9                (Whereupon, Haynes Exhibit 6,

10            E-mail was marked for identification,

11            as of this date by the reporter.)

12               MS. KHINDRI:  I'll just note for

13            the record, I believe this was that

14            the document that's been marked as

15            Haynes Exhibit number 6, has been

16            produced by plaintiff in the course of

17            production.  However, I'm unable to

18            locate the specific document with the

19            Bates numbering.

20               (Whereupon, the witness perused

21            the aforementioned document.)

22       Q.   Ms. Haynes, have you had a chance to

23    review the e-mail?

24       A.   Yes.

25       Q.   Based on the e-mail that you just

A. HAYNES

1

2     A.   I told her by e-mail.  We spoke on

3   the phone.  Yes.

4     Q.   Did you recommend that she increase

5   her offer to any specific amount?

6     A.   I told her the offers that we had and

7   where she needed to come in at.  Even in the

8   exhibit that she presented, we were

9   countering her lower than the fair market.

10  People could come to the open house.  She was

11  still giving -- being given numbers that were

12  to her advantage and less than other people.

13    Q.   What do you mean, "less than other

14  people"?  What do you mean by that?

15    A.   In the exhibit presented earlier, I

16  talk about how we were going to counter the

17  offer with 490 and we would counter Ms. Doe

18  with 485.  We'd have to look back at the

19  exhibit.

20    Q.   I believe that was promised on

21  receiving an actual written offer?

22    A.   No.

23    Q.   Exhibit 2.

24    A.   Second to last paragraph.

25    Q.   Right.  The second paragraph of that

1                    A. HAYNES

2   e-mail states "Regarding Ms. Doe's offer of

3   $444,000, you know that it is low compared to

4   the one for $480,000 that will come in

5   tomorrow.  I will counter Ms. Doe's offer

6   with $485,000 and see if she will come up to

7   that number or something close to that

8   number."

9          The way I interpret that is any

10  counter would be contingent on an offer

11  actually coming in.

12          But regardless, did you -- at any

13  point after this e-mail, from you to Dr.

14  Champel on May 2nd, did you at any point

15  after that e-mail, counter -- speak to Ms.

16  Doe and advise her that you had received an

17  offer for $485,000?

18          MR. SAULITIS:  400.

19     Q.  For $400,000.

20          MR. SAULITIS:  Objection to form.

21     A.  Please repeat the question.

22          (The requested portion of the record

23      was read by the reporter.)

24     Q.  Did you ever -- after the open house,

25  where you anticipated getting offers in for

```
1                      A. HAYNES
2    $480,000, at least, did you ever go back to
3    Ms. Doe and ask her to submit an offer
4    greater than $480,000?
5        A.   That's what -- I'll refer back to "I
6    will counter Ms. Doe's offer with $485,000."
7        Q.   But did you?
8        A.   Yes.
9        Q.   Do you recall how you countered that
10   to Ms. Doe?  Did you speak to her on the
11   phone?  Did you write her an e-mail?
12       A.   I don't remember, but you can look at
13   the records.
14       Q.   Well, I'm asking because we don't
15   have any record of there being a counter.
16            So could it have been by telephone?
17       A.   It could have been, yes.
18       Q.   Text message, maybe?
19       A.   Probably telephone or e-mail.
20       Q.   After your conversation and
21   correspondences with AJ Johnson, were you
22   satisfied with any concerns you may have had
23   about Ms. Doe's financial ability to purchase
24   the apartment and obtain financing in
25   connection with her purchase?
```

1          A. HAYNES

2     this in some kind of written material of any

3     kind?

4          MR. SAULITIS:  Objection to form.

5          A.  Yes.  It is something that is taught

6     to you at real estate school.  You have a

7     financial fiduciary responsibility to ensure

8     that you are representing your client in the

9     highest regard.  Anyone could make an offer

10    for an apartment, not everyone is qualified

11    to purchase the apartment.

12         Q.  Are you specifically instructed to

13    review financial documentation?

14         MR. SAULITIS:  Objection to form.

15         A.  Dr. Champel left it to me and he said

16    it in his e-mail.  "I trust you.  I go with

17    what you inform me."  And I gave him ever

18    single information about the purchasers in

19    regard to their finances so he can make a

20    final decision.  I collect, I give over, and

21    he makes a decision.

22         Q.  So would it be fair to say that you

23    use your discretion in deciding what

24    documents and information to request of

25    purchasers during the course of the bidding

1          A. HAYNES

2     here, this is the amount that you'll need to

3     bid."  Did you ever --

4          A.   That is not how a highest and best

5     works.  Once you exclude yourself, you're out

6     of the process.

7          Q.   Isn't it true that Ms. Doe came back

8     in around, first or second week of May, and

9     increased her offer to 470?

10              MR. SAULITIS:  Objection to form.

11         A.   Was that after the highest and best?

12         Q.   I'm not sure when the highest and

13    best was.

14         A.   If it was after the highest and best,

15    it would be too late.

16         Q.   What does the highest and best mean?

17         A.   It means that anybody who has

18    interest in purchasing the apartment, has a

19    deadline that was given to them to submit

20    their highest and their best offer to

21    purchase the apartment.  There is no

22    renegotiating after that.  Once a seller

23    accepts an offer, then it goes to the

24    attorney.  After the transaction summary is

25    completed, the attorneys get the contract